**Aaron ISBY, Plaintiff–Appellant,**

v.

**Dick CLARK, et al., Defendants–Appellees.**

**No. 95–1739.**

United States Court of Appeals, Seventh Circuit.

Submitted June 17, 1996.[1]

Decided Nov. 12, 1996.

---

1. After an examination of the briefs and the record, we have concluded that oral argument is unnecessary, and the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a); Cir. R. 34(f).

Aaron E. Isby, Carlisle, IN, pro se.

Martha J. Arvin, Office of the Atty. Gen., Indianapolis, IN, for Richard Clark.

Diane Marger Moore, Office of the Atty. Gen., Indianapolis, IN, for Herbert Newkirk and Ronald Batchelor.

Before POSNER, Chief Judge, and PELL and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

A recalcitrant prisoner might well be defined as one who is hard to deal with or manage—one who often resists authority or control. The adjective may be a good fit for Aaron Isby, an inmate in the Indiana state prison system. Isby is also a frequent litigator in this court, having filed more than 30 appeals with us over the last several years. The primary issue on the appeal we consider today arises from Isby's claim that he suffered cruel and unusual punishment while confined in the most restrictive segregation unit at the Indiana State Prison in Michigan City, Indiana, during portions of the fall of 1990 and the winter and spring of 1991.

Isby filed his initial complaint in this case on February 1, 1991, under 42 U.S.C. § 1983, alleging violations of the Eighth and Fourteenth Amendments. Specifically, he claimed that conditions under which he was

confined in the Special Management Unit (SMU) of the Indiana State Prison constituted cruel and unusual punishment and that being transferred to the unit without notice or a hearing violated his due process rights. The defendants in the suit are Dick Clark, the former superintendent of the institution; Herbert Newkirk, the assistant superintendent; and Ronald Batchelor, a "custody supervisor." Isby's procedural due process claim was dismissed on the defendants' motion for summary judgment, and the Eighth Amendment claims came up short following a bench trial.

Before we get to Isby's challenge to these decisions, we address his contention that the district court abused its discretion in refusing to enter a default judgment in his favor. He claims he was entitled to a default judgment because the defendants did not have an answer on file to his amended complaint, which was filed on August 27, 1992. The defendants did file a timely answer to Isby's original complaint back in April of 1991 but slipped up and failed to file a responsive pleading to the amended complaint. The absence of an answer escaped everyone's attention until the second day of the bench trial on the Eighth Amendment claim, which occurred in 1993.

■ A default judgment to Isby on these facts was properly denied. The original answer was a denial of Isby's claim, and everyone here assumed that the Indiana officials continued to deny the essence of the claims made in the amended complaint. Discovery and other pretrial matters, including the motion for summary judgment, proceeded on that basis. While the defendants should have filed an amended answer or asked that their original one stand for their answer to the amended complaint, this was clearly a no harm, no foul situation. Because default judgments are not favored, especially in hotly contested cases, the district court did not abuse its discretion when it allowed the amended answer to be filed late in the game.

■ The essence of the procedural due process claim is that Isby was transferred to the SMU three times without prior notice or hearings. Isby argues that under *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41

L.Ed.2d 935 (1974), he should have received notice and a hearing prior to being placed in the unit. But there is no question that at the time Isby was transferred to the prison (from the Indiana State Reformatory) and placed in the SMU, he was already scheduled to spend his time in disciplinary segregation until the year 2000. His subsequent placements in the SMU were within his original disciplinary sentence, and no pre-transfer notices or hearings were required. Which brings us to the major issue in this case, Isby's contention that his rights under the Eighth Amendment were violated.

The Eighth Amendment claim was tried to the court-before a magistrate judge on consent—for two days in August of 1993. The judge resolved the case some 19 months later, in March of 1995, when he found in favor of the defendants. Needless to say, 19 months between trial and decision is not particularly consistent with the "just, speedy, and inexpensive determination" of civil actions contemplated by the rules. See Rule 1 of the Federal Rules of Civil Procedure. We think the process should move more briskly. Too much time between a trial and a decision sometimes causes findings and conclusions to get a bit fuzzy, and that seems to be what happened here. We say no more on this point and move on to Isby's Eighth Amendment claim.

To better understand the claim, it is helpful to know a little bit about Mr. Isby. Prior to October 12, 1990, Isby was sentenced to disciplinary segregation time until the year 2000 for serious misconduct while incarcerated at the Indiana State Reformatory. On October 12, 1990, Isby was housed in the "disciplinary segregation" unit at the reformatory. On that date, he stabbed two correctional officers (one got it in the neck), and this conduct earned him a ticket to the Indiana State Prison on October 19, where he was placed in the SMU. The SMU is a disciplinary segregation unit, consisting of three cells, for offenders who cannot be housed safely in other disciplinary segregation units. Four days later, on October 23, 1990, Isby was transferred to a less secure disciplinary segregation unit, the "New Services Building." A month later, on Novem-

ber 27, Isby stabbed another inmate in the chest with an ice-pick-type weapon, and this earned him a return visit to the SMU.

Isby's second stay in the SMU lasted until January 23, 1991. He went back into the SMU on April 17, 1991, because he assaulted a staff member. His third stay in the SMU ended on June 13, 1991. All of the transfers to the SMU were authorized by either the superintendent or the assistant superintendent of the prison, and in each case his continued detention in the unit was reviewed every seven days by either Superintendent Clark or Mr. Newkirk. The various attacks and assaults have extended Isby's time in disciplinary segregation to June 28, 2019.

Isby's three stays in the SMU were for 4, 58, and 57 days, a total of 119 days in all. And by all accounts, the SMU is not a pleasant place. It is designed to house the most difficult and dangerous inmates in the Indiana penal system. Isby's attacks on prison staff members and fellow inmates made him, according to the prison authorities, a fit candidate for placement in the SMU. On this record, it would be hard to argue with that conclusion.

Prisons, of course, are not Hilton hotels. And disciplinary segregation units within prisons are not like rooms at a Motel 6. But even nasty prisoners cannot be knowingly housed in ghastly conditions reminiscent of the Black Hole of Calcutta. *See Jackson v. Duckworth,* 955 F.2d 21 (7th Cir.1992). Whether the SMU, during Isby's stays, was so miserable that he endured cruel and unusual punishment in violation of the Eighth Amendment was the issue tried below.

█ The Eighth Amendment prohibits punishments that are "cruel and unusual." In a case involving conditions of confinement in a prison, two elements are required to establish violations of the Eighth Amendment's cruel and unusual punishments clause. First, an objective element requires a showing that the conditions deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). The second requirement is a subjective element—establishing a defen-

dant's culpable state of mind. *Farmer,* —— U.S. at ——, 114 S.Ct. at 1977. In this case, the district court concluded its decision by noting: "Although Isby *may have* endured cruel and unusual conditions, he did not suffer cruel and unusual punishment." (Emphasis added.) The judge also noted, after reviewing the evidence presented at trial, that "[t]he deprivations experienced by Isby during his stays on the SMU *come close* to satisfying the objective component" (emphasis added) of an Eighth Amendment claim. So the result, in the district court, was that Isby—"may have"—"come close"—to satisfying the first part of an Eighth Amendment claim but that he didn't prove the second part (the subjective element) so he loses his case. For the reasons that follow, we think the case must be returned to the district court for more precise findings.

We are uncertain, after reading the judge's memorandum dismissing this case, just what he found the facts to be. For instance, the judge notes that during Isby's second stay at the SMU (November 27, 1990, to January 23, 1991) his cell "became so cold in January, 1991, that he had chills and could not keep warm." We are not certain whether this is merely a reiteration of Isby's complaint about the temperature in the cell or an independent finding based on conflicting evidence that the cell, during a time, was far too cold. We are confused on this point because the judge also says that the temperature in the hallway in front of Isby's cell was always "between 68 and 74 degrees." Also, if the cell was unreasonably cold, was this a constant or only an occasional condition? We don't know, and that sort of a finding, one way or another, should be made.

Isby also complained that the SMU cell was filthy, with dried blood, feces, urine, and food on the walls. The judge seems to (but again we're not sure) agree with Isby on this point, but he goes on to note that it's the "practice of the ISP to leave feces and blood on the walls and floor of the SMU cells if they were put there by the residing inmate." If feces were on the wall—but Isby put it there—the claim on this point that the defendants violated the Eighth Amendment would lose a lot of its steam. Just like segregated

disciplinary inmates who abuse exercise privileges can see those privileges reduced below contemporary Eighth Amendment standards, see *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir.1988), an inmate who causes filthy conditions to exist may not have a cruel and unusual leg to stand on.

In the judge's conclusions of law he says, "The combination of … *poor sanitation* … and [lists other conditions], and length of confinement may well have had the reinforcing effect of depriving Isby of basic human needs." *Sanitation*, we assume, includes things like odors and general cleanliness around the cell. Yet the evidence on these points was disputed (Isby said the foul stench was "unbearable" but Batchelor said the only odor he noticed was a "disinfectant smell" and that the SMU was "liveable" and generally "sanitary and clean.") Trial tr. pp. 16, 206, 260, and 269. Who did the judge believe? While he seems to have believed Isby, we can't be sure.

In short, many of the allegedly inhumane conditions here—temperature, sanitation, and ventilation, to name a few—were contested. We have to know just how these claims were weighed by the magistrate judge. Who he believed on these conflicting claims is critical. Now, it may well be that the judge thought precision wasn't particularly important because he was going to find that the subjective component of the claim—a culpable state of mind on the part of the defendants—was lacking. But it seems to us that if the conditions were truly as dreadful as Isby claims, the defendants, given their closeness to the situation, would in all probability have had the requisite state of mind to satisfy the subjective component of an Eighth Amendment claim. We know this is an old case, and although it pains us, we nevertheless conclude that a remand is necessary so the capable magistrate judge can more fully make and explain his findings and conclusions. So ordered.